**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| AMARTSENGEL SANJAA,<br>*Petitioner*,<br><br>v.<br><br>JEFFERSON B. SESSIONS III, Attorney General,<br>*Respondent*. | No. 13-73098<br><br>Agency No<br>A200-684-960<br><br>OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted May 12, 2017
Seattle, Washington

Filed July 21, 2017

Before:  M. Margaret McKeown, Carlos T. Bea,
and N. Randy Smith, Circuit Judges.

Opinion by Judge Bea

# SUMMARY[*]

## Immigration

The panel denied a petition for review of the Board of Immigration Appeals' denial of withholding of removal and protection under the Convention Against Torture to a citizen of Mongolia.

The panel held that substantial evidence supported the Board's determination that Sanjaa was targeted because of his role in a drug-trafficking investigation, and not on account of his political opinion, his purported whistleblowing activity, or his status as a former police officer.

The panel held that the witness protection provisions of Article 24 of the United Nations Convention Against Transnational Organized Crime ("UN-CATOC") do not provide an independent basis for relief from removal, because UN-CATOC is not self-executing, and has not been implemented through congressional legislation.

## COUNSEL

Nicholas W. Marchi (argued), Carney & Marchi P.S., Seattle, Washington, for Petitioner.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Andrew B. Insenga (argued), Trial Attorney; Paul Fiorino, Senior Litigation Counsel; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

---

**OPINION**

BEA, Circuit Judge:

Amartsengel Sanjaa, a native and citizen of Mongolia, served as a police officer in his home country. When he began to investigate a drug-trafficking operation that involved Lkhagvasuren, a famous Mongolian singer, and Naranbaatar, the son of a parliamentarian, Sanjaa was beaten and threatened several times by unidentified individuals. The individuals told Sanjaa that they knew he was a police officer and demanded that he stop the drug-trafficking investigation and destroy any evidence from the investigation. Although the drug-trafficking investigation eventually led to the arrest and trial of Lkhagvasuren and Naranbaatar, Sanjaa no longer felt safe in Mongolia. In January 2006, he entered the United States on an F-1 student visa.

Sanjaa remained in the United States without authorization after his student status ended in February 2008. The Department of Homeland Security issued him a Notice to Appear in May 2010. Sanjaa conceded removability, but applied for asylum, withholding of removal, and Convention Against Torture ("CAT") relief. The Immigration Judge ("IJ") found Sanjaa's testimony credible, but denied all forms of relief. The Board of Immigration Appeals ("BIA") affirmed the IJ's decision and dismissed Sanjaa's appeal. Sanjaa conceded his ineligibility for asylum because he filed his application after the one-year deadline imposed by the

REAL ID Act. *See* 8 U.S.C. § 1158(a)(2)(B). The BIA denied Sanjaa's withholding of removal claim because Sanjaa's persecution resulted not from his political opinion or membership in a particular social group, but from his role in the drug-trafficking investigation. The BIA denied Sanjaa's application for CAT relief because Sanjaa failed to establish that it was more likely than not that, if returned to Mongolia, Sanjaa would be tortured by or with the acquiescence of the Mongolian government. Sanjaa has never been tortured by government officials, and the police investigated every incident of harassment and violence reported by Sanjaa.

The BIA also addressed Sanjaa's argument that he was entitled to relief from removal under the United Nations Convention Against Transnational Organized Crime ("UN-CATOC").[1] The UN-CATOC is a treaty signed and ratified by the United States that aims, in relevant part, to protect witnesses of transnational organized crime from retaliation and intimidation. The BIA concluded that the UN-CATOC does not provide an independent basis for relief from removal. Sanjaa timely appealed.

We have jurisdiction under 8 U.S.C. § 1252. We deny the petition for review.

## I. Withholding of Removal and CAT Relief

We review denials of withholding of removal and CAT relief for substantial evidence. *See, e.g.*, *Garcia-Milian v. Holder*, 755 F.3d 1026, 1031 (9th Cir. 2014). To reverse the BIA, we must determine "'that the evidence not only

---

[1] The United Nations Convention Against Transnational Organized Crime art. 24, Nov. 15, 2000, 2225 U.N.T.S. 209.

*supports* [a contrary] conclusion, but *compels* it—and also compels the further conclusion' that the petitioner meets the requisite standard for obtaining relief." *Id.* (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992)).

"To qualify for withholding of removal, an alien must demonstrate that it is more likely than not that he would be subject to persecution on one of the specified grounds." *See Robleto-Pastora v. Holder*, 591 F.3d 1051, 1057 (9th Cir. 2010) (citation omitted).[2] "While a showing of past persecution entitles an alien to a presumption of eligibility for withholding of removal, it is the alien's burden to establish such persecution." *Id.*

The BIA found Sanjaa ineligible for withholding of removal because the private individuals who assaulted Sanjaa did not persecute him on account of his political opinion or membership in a particular social group. Sanjaa argues that the BIA erred because the evidence compels the conclusion that he was persecuted on account of his status as a whistleblower, his pro-government political opinion, and his membership in the particular social group of former police officers. We disagree.

As an initial matter, the physical harm Sanjaa suffered in Mongolia rose to the level of "persecution." *See Ahmed v. Keisler*, 504 F.3d 1183, 1194 (9th Cir. 2007). However,

---

[2] *See also* 8 C.F.R. § 1208.13(b)(1) ("An applicant shall be found to be a refugee on the basis of past persecution if the applicant can establish that he or she has suffered persecution in the past in the applicant's country of nationality or, if stateless, in his or her country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion, and is unable or unwilling to return to, or avail himself or herself of the protection of, that country owing to such persecution.").

Sanjaa failed to meet his burden to establish that he was
persecuted "on account of" one of the statutorily protected
grounds. *See Barajas-Romero v. Lynch*, 846 F.3d 351, 360
(9th Cir. 2017) (holding that petitioners who apply for
withholding of removal must establish that a statutorily
protected ground was "a reason" for their persecution). We
address each of Sanjaa's claims below.

## A.  Political Opinion and Whistleblower Status

The BIA did not err in concluding that Sanjaa was not
persecuted on account of his political opinion. Sanjaa stated
in his declaration and testimony that his assailants attacked
him because of his role in the drug-trafficking investigation.
His attackers said nothing during their attacks about any
political opinion held by Sanjaa, and nothing else in the
record implies that Sanjaa's political opinion had anything
to do with the attacks. Therefore, the evidence does not
compel the conclusion that Sanjaa was persecuted on
account of his political opinion. *See Cruz-Navarro v. INS*,
232 F.3d 1024, 1030 (9th Cir. 2000) ("During their attack,
the guerillas referred to Cruz as a 'policeman' and
'informer.' Neither of these references implies that the
guerillas believed Cruz to hold political beliefs contrary to
their own, much less that they attacked him because of such
beliefs."); *see also Grava v. INS*, 205 F.3d 1177, 1181 n.3
(9th Cir. 2000) ("Purely personal retribution is, of course,
not persecution on account of political opinion.").

The evidence also does not compel the conclusion that
Sanjaa was attacked on account of any whistleblowing
activity. Whistleblowing and opposition to government
corruption may constitute the expression of a political
opinion. *See Baghdasaryan v. Holder*, 592 F.3d 1018, 1024
(9th Cir. 2010); *Sagaydak v. Gonzales*, 405 F.3d 1035, 1042
(9th Cir. 2005) ("[A] victim who is targeted for exposing

government corruption is persecuted 'on account of' political opinion. Retaliation for investigating or publicizing corruption by political figures is by its very nature a political act."). However, Sanjaa did not investigate or publicize corruption by political figures.[3] He investigated a criminal drug-trafficking operation. His attackers told Sanjaa he was being attacked because of his role in the drug-trafficking investigation; they said nothing about any reports Sanjaa made regarding police or government corruption. Moreover, Sanjaa never reported his belief that the police were corrupt to the authorities, even though his fellow police officers advised him to report the perceived corruption to the Special Crimes Investigation Team at the City Police Department. Therefore, the evidence does not compel the conclusion that Sanjaa was persecuted because of his purported whistleblowing activity or opposition to government corruption.

## B. Particular Social Group of Former Police Officers

The BIA also did not err in its conclusion that Sanjaa was not persecuted on account of his membership in the particular social group of former police officers. The Ninth Circuit has recognized "that a particular social group of *former* officers is conceivable." *Ayala v. Holder*, 640 F.3d 1095, 1097 (9th Cir. 2011) (emphasis added). Therefore, we must consider whether the evidence of persecution Sanjaa experienced *after* he quit his job as a police officer compels the conclusion that Sanjaa was attacked on account of his

---

[3] The fact that Sanjaa investigated the relative of a political figure is irrelevant. Although some would say that all politicians are crooks, no one says that all crooks are politicians.

membership in the particular social group of former police officers.

The sole instance of persecution that Sanjaa experienced after he quit his job as a police officer—a physical attack by unknown individuals in an internet café Sanjaa owned—occurred in response to a meeting Sanjaa had with police officers involved in the drug-trafficking investigation. The unknown individuals told Sanjaa that they were sent by Lkhagvasuren, the famous Mongolian singer. They also told Sanjaa that he should not testify. The personal retribution Sanjaa suffered at his internet café because of his role in the drug-trafficking investigation is not cognizable under the INA. *See Ayala*, 640 F.3d at 1098 ("[I]f a former police officer [is] singled out for reprisal, not because of his status as a former police officer, but because of his role in disrupting particular criminal activity, he [is] not . . . considered, without more, to have been targeted as a member of a particular social group." (quoting *Matter of C-A-*, 23 I. & N. Dec. 951, 959 (BIA 2006))). Therefore, Sanjaa's claim that he was persecuted on account of his membership in the particular social group of former police officers in Mongolia also fails.

## II. United Nations Convention Against Transnational Organized Crime

This court reviews de novo the interpretation and application of treaty language. *See, e.g.*, *King Mountain Tobacco Co. v. McKenna*, 768 F.3d 989, 992 (9th Cir. 2014). When the BIA is not charged with administering a statute—or in this case, a treaty—the BIA's interpretation of that statute or treaty is not afforded any deference. *See, e.g.*, *Covarrubias Teposte v. Holder*, 632 F.3d 1049, 1052 (9th Cir. 2011).

Sanjaa argues that Article 24 of the UN-CATOC provides an independent basis for relief from removal. Article 24 of the UN-CATOC reads as follows:

> 1. Each State Party shall take appropriate measures within its means to provide effective protection from potential retaliation or intimidation for witnesses in criminal proceedings who give testimony concerning offences covered by this Convention and, as appropriate, for their relatives and other persons close to them.

> 2. The measures envisaged in paragraph 1 of this article may include, inter alia, without prejudice to the rights of the defendant, including the right to due process:

>> (a) Establishing procedures for the physical protection of such persons, such as, to the extent necessary and feasible, relocating them and permitting, where appropriate, non-disclosure or limitations on the disclosure of information concerning the identity and whereabouts of such persons;

>> (b) Providing evidentiary rules to permit witness testimony to be given in a manner that ensures the safety of the witness, such as permitting testimony to be given through the use of communications technology such as video links or other adequate means.

3. State Parties shall consider entering into agreements or arrangements with other States for the relocation of persons referred to in paragraph 1 of this article.

4. The provisions of this article shall also apply to victims insofar as they are witnesses.

UN-CATOC art. 24. Whether the witness-protection provisions in Article 24 of the UN-CATOC provide an independent basis for relief from removal is a matter of first impression in the Ninth Circuit. However, the Second Circuit has held that the witness-protection provisions do not provide an independent basis for relief from removal. *See Doe v. Holder*, 763 F.3d 251, 257 (2d Cir. 2014). In *Doe*, the Second Circuit denied the petition for review of a native and citizen of Ghana who argued that the witness-protection provisions in Article 24 of the UN-CATOC provide an independent basis for relief from removal in immigration proceedings. *Id.* at 254. The Second Circuit explained that Article 24 of the UN-CATOC could not be domestically enforced unless its provisions are "self-executing" or were implemented through congressional legislation. *Id.* at 255; *see also Medellín v. Texas*, 552 U.S. 491, 505 (2008) ("[W]hile treaties may comprise international commitments . . . they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms." (citation omitted)).

Since the UN-CATOC's ratification, Congress has not passed legislation to implement the witness-protection provisions in Article 24. *See Doe*, 763 F.3d at 256–57. Therefore, the Second Circuit analyzed whether the witness-

protection provisions in Article 24 of the UN-CATOC are "self-executing." *Id.* at 255–57.**[4]**

Courts interpret the text of a treaty *de novo* to determine whether its provisions are self-executing. *See Medellín*, 552 U.S. at 514 ("The interpretive approach employed by the Court today—resorting to the text—is hardly novel."). Article 24 of the UN-CATOC pledges that each state party "shall take appropriate measures within its means to provide effective protections" for witnesses. These measures "may include, inter alia," physical protection, relocation, non-disclosure of the witness's identity and location, or the use of video-link testimony. Reading Article 24 as a whole and in context, the permissive language leaves each state party to implement whichever protections are "appropriate"**[5]** and "within its means." This provision "addresses itself to the political, *not* the judicial branch," so it is not "a rule for the Court." *Medellín*, 552 U.S. at 516 (citation omitted). In addition, the use of the nebulous term "effective"—which is never defined in the treaty—further demonstrates that Article 24 is not a "directive to domestic courts" that "by itself give[s] rise to domestically enforceable federal law." *Id.* at 505 n.2, 508. We agree with the Second Circuit that

---

**[4]** We note that the question whether a treaty is self-executing is distinct from whether the treaty provides a private right of action. *See Medellín*, 552 U.S. at 506 n.3.

**[5]** Webster's defines "appropriate" as "belonging peculiarly," "special," or "fit or proper; suitable; as *appropriate* manners." Webster's New Unabridged Twentieth Century Dictionary of the English Language 91 (2d ed. 1979). There is scarcely a word more descriptive of unbridled subjective discretion than "appropriate." It has no objective meaning and cannot be used to describe what is an obligation, as opposed to a choice.

the discretionary and vague language in Article 24 reflects a "non-self-executing undertaking." *Doe*, 763 F.3d at 256.

The Second Circuit also concluded that Article 34 of the UN-CATOC, titled "Implementation of the Convention," reflects an understanding that the provisions of the UN-CATOC would not be self-executing. *Id.* Article 34 provides that "[e]ach State Party shall take necessary measures, *including legislative and administrative measures* . . . to ensure the implementation of its obligations under this Convention." UN-CATOC art. 34 (emphasis added). Moreover, Article 34 states that a signatory must "take necessary measures" only "in accordance with fundamental principles of its domestic law . . . ." *Id.* Because Article 34 of the UN-CATOC acknowledges that legislative and administrative action could be necessary to implement the UN-CATOC, the Second Circuit concluded that the mandatory language in Article 24 of the UN-CATOC—that signatories "shall take appropriate measures" to provide effective witness protection—did not create a self-executing obligation. *See Doe*, 763 F.3d at 256.

The Second Circuit also analyzed interpretations of the UN-CATOC by the executive branch. *See id.* at 256–57; *see also Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."). "When submitting the treaty to the President, the Secretary of State explained that the witness-protection measures under Article 24 are undertaken 'in [a State Party's] discretion,' and recommended that the Senate include a declaration that the only exceptions to the 'general understanding that the provisions of the [UN-CATOC] are non-self-executing' are the detailed provisions of Articles 16

and 18." *Doe*, 763 F.3d at 256 (quoting S. Treaty Doc. No. 108–16 (2004)).[6] Because the plain language of the UN-CATOC does not support a reading that the witness-protection provisions in Article 24 are self-executing and the interpretation of those provisions by the executive branch conforms to the natural reading of the treaty's text, the Second Circuit held that Article 24 was not self-executing and therefore did not provide an independent basis for relief from removal.

We adopt the persuasive reasoning of the Second Circuit and hold that the UN-CATOC does not provide an independent basis for relief from removal in immigration proceedings. Because the UN-CATOC has not been implemented through congressional legislation and is not self-executing as to the relief sought here, petitioners may not rely on its provisions for relief from removal.

**PETITION DENIED.**

---

[6] Article 16 describes extradition obligations. UN-CATOC art. 16. Article 18 provides that signatories "shall afford one another the widest measure of mutual legal assistance in investigations, prosecutions and judicial proceedings in relation to the offences covered by this Convention . . . ." UN-CATOC art. 18.