**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| REPUBLIC OF THE MARSHALL ISLANDS, a non-nuclear-weapon State party to the Treaty on the Non Proliferation of Nuclear Weapons, *Plaintiff-Appellant*, <br><br> v. <br><br> UNITED STATES OF AMERICA; DONALD J. TRUMP, The President of the United States of America; DEPARTMENT OF DEFENSE; JAMES MATTIS, Secretary, Department of Defense; DEPARTMENT OF ENERGY; RICK PERRY, Secretary, Department of Energy; NATIONAL NUCLEAR SECURITY ADMINISTRATION, *Defendants-Appellees.* | No. 15-15636 <br><br> D.C. No. 4:14-cv-01885-JSW <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted March 15, 2017
San Francisco, California

Filed July 31, 2017

Before:  M. Margaret McKeown and Jay S. Bybee, Circuit Judges, and Susan Oki Mollway,* District Judge.

Opinion by Judge McKeown

**SUMMARY**\*\*

**Marshall Islands / Treaties**

The panel affirmed the district court's dismissal of a suit brought by the Republic of the Marshall Islands seeking a declaration that the United States was in breach of its treaty obligations under Article VI of the Treaty on the Non-Proliferation of Nuclear Weapons, and asking the court to order that the United States engage in good-faith negotiations.

The panel held that Article VI was non-self-executing. The panel further held that because non-self-executing treaty provisions were not judicially enforceable, claims seeking to enforce them were nonjusticiable.

The panel held that the Marshall Islands' asserted injuries were not redressable because Article VI could not be enforced in federal court.  The panel also found that the

---

\* The Honorable Susan Oki Mollway, United States District Judge for the District of Hawaii, sitting by designation.

\*\* This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Marshall Islands' claims presented inextricable political questions that were nonjusticiable and must be dismissed.

## COUNSEL

Laurie B. Ashton (argued) and Alison Chase, Keller Rohrback LLP, Phoenix, Arizona; Juli E. Farris and Lynn Lincoln Sarko, Keller Rohrback LLP, Seattle, Washington; for Plaintiff-Appellant.

Sushma Soni (argued) and Douglas N. Letter, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., for Defendants-Appellees.

Scott Yundt, Livermore, California, as and for Amicus Curiae Tri-Valley Communities Against a Radioactive Environment.

Henry M. Willis, Schwartz Steinsapir Dohrmann & Sommers LLP, Los Angeles, California; Margot Nikitas, Staff Attorney; Joseph Cohen, General Counsel; United Electrical, Radio and Machine Workers of America, Pittsburgh, Pennsylvania; for Amici Curiae United Electrical, Radio and Machine Workers of America (UE), International Commission for Labor Rights, and Labor and Employment Committee of the National Lawyers Guild.

Janet Benshoof, New York, New York, as and for Amicus Curiae Global Justice Center.

Randy Baker, Seattle, Washington; Anabel Dwyer, Elizabeth Shafer, and John Burroughs, Lawyers Committee on Nuclear Policy, New York, New York, for Amicus Curiae Lawyers Committee on Nuclear Policy.

Daniel U. Smith, Smith & McGinty, San Francisco, California, for Amici Curiae Physicians for Social Responsibility, International Physicians for the Prevention of Nuclear War, and Pax Christi International.

Andrea R. St. Julian, San Diego, California, for Amici Curiae Hans M. Kristensen, Robert Alvarez, Dr. James E. Doyle, and Nuclear Watch New Mexico.

## OPINION

McKEOWN, Circuit Judge:

Not all treaties are created equal in terms of enforceability. Although the Supremacy Clause guarantees that "all Treaties . . . shall be the supreme Law of the Land," U.S. Const. art. VI, cl. 2, paradoxically not every treaty provision is enforceable in our domestic courts. Article VI of the Treaty on the Non-Proliferation of Nuclear Weapons (the "Treaty" or the "Non-Proliferation Treaty") is one such provision: it calls on each party to the Treaty "to pursue negotiations in good faith on effective measures" to end the nuclear arms race and accomplish nuclear disarmament.[1]

Armed with Article VI, one of the treaty parties, the Republic of the Marshall Islands, filed suit, asking the federal court to declare the United States in breach of its treaty obligations and to order the United States to engage in good-faith negotiations. These claims are nonjusticiable—Article VI is not directly enforceable in federal court, the

---

[1] Treaty on the Non-Proliferation of Nuclear Weapons art. VI, *opened for signature* July 1, 1968, 21 U.S.T. 483, 729 U.N.T.S. 161.

Marshall Islands' asserted injuries are not redressable, and the claims raise nonjusticiable political questions.

At bottom, the suit is doomed because diplomatic negotiations among parties to this Treaty fall quintessentially within the realm of the executive, not the judiciary. Parleying a halt to the nuclear arms race and achieving nuclear disarmament involve decision-making delegated to the political branches. We affirm the district court's dismissal of the complaint. Asking the federal court to order the United States to negotiate in "good faith" on "effective measures" for nuclear disarmament puts the judiciary in the role of nanny to the executive. Under our system of separation of powers, the federal court cannot give the Marshall Islands the judicial relief it seeks.

## BACKGROUND

The Non-Proliferation Treaty entered into force in 1970. After President Johnson signed and the Senate gave its consent, President Nixon ratified the Treaty for the United States. The Marshall Islands acceded to the Treaty in 1995. Over 180 states are now parties.

To promote the Treaty's goal of nuclear disarmament, Article VI provides that "[e]ach of the Parties to the Treaty undertakes to pursue negotiations in good faith on effective measures relating to cessation of the nuclear arms race at an early date and to nuclear disarmament, and on a treaty on general and complete disarmament under strict and effective international control." Although the Treaty includes no mechanism to address alleged breaches, the United States acknowledges that the Treaty "is a legally binding instrument under international law" and that breach "may give rise to international legal remedies."

In April 2014, the Marshall Islands sued the United States in federal district court, seeking declaratory and injunctive relief and claiming that the United States breached Article VI by failing to pursue good-faith negotiations. The genesis for this action is what the Marshall Islands describes as "the grim legacy of the United States nuclear weapons program," including the detonation of sixty-seven nuclear weapons in the Marshall Islands that resulted in "horrific and multi-generational consequences from nuclear proliferation."

In Count 1, the Marshall Islands requested a declaration that Article VI imposes obligations on the United States to:

> (1) "pursue negotiations in good faith on effective measures relating to cessation of the nuclear arms race at an early date and to nuclear disarmament"; and

> (2) "bring to a conclusion negotiations leading to nuclear disarmament in all its aspects under strict and effective control."

In Count 2, the Marshall Islands requested a declaration that the United States is "in continuing breach" of its Article VI obligation to "pursue negotiations in good faith on effective measures relating to cessation of the nuclear arms race at an early date" and "to nuclear disarmament."

The Marshall Islands sought to force the United States— "within one year" following entry of the requested declaratory judgment—to "take all steps necessary" to comply with its Article VI obligations, "including by *calling for and convening* negotiations for nuclear disarmament in all its aspects."

The district court granted the United States' motion to dismiss on two grounds.  The court concluded that the Marshall Islands lacked standing because the court had no power to bind other state parties not before the court and the asserted injury "cannot be redressed by compelling the specific performance by only one nation to the Treaty." *Republic of the Marshall Islands v. United States*, 79 F. Supp. 3d 1068, 1072 (N.D. Cal. 2015).  The court also found that the case raised nonjusticiable political questions.  *Id.* at 1073–74.  Although the United States also argued that Article VI is not self-executing and therefore not directly enforceable in domestic courts, the district court said that this issue was "irrelevant to the enforcement by a state-party that is a signatory to the Treaty."  *Id.* at 1074 n.2.

## ANALYSIS

This is not your average treaty case.  Unlike the typical treaty-enforcement actions brought by private individuals, this case involves one state party seeking to enforce its treaty rights in the domestic court of another state party.  This unorthodox effort fails because the claims are nonjusticiable.

Whether examined under the rubric of treaty self-execution, the redressability prong of standing, or the political question doctrine, the analysis stems from the same separation-of-powers principle—enforcement of this treaty provision is not committed to the judicial branch.  Although these are distinct doctrines for addressing treaty enforcement, there is significant overlap.  For example, considerations applicable to self-execution, such as whether the judiciary is the appropriate branch for direct enforcement, also play out in the standing and political question analysis.  *See* Ann Woolhandler, *Treaties, Self-Execution, and the Public Law Litigation Model*, 42 Va. J. Int'l L. 757, 761 (2002) (noting "the problems of

distinguishing among the doctrines of non-self-execution, standing, and political question in the treaty context" but concluding that all three "address some aspect of whether there exists either a judicially cognizable injury on the part of the plaintiff or a judicially cognizable duty on the part of the defendant"). As the Supreme Court explained long ago, a treaty will often "depend[] for the enforcement of its provisions on the interest and the honor of governments which are parties to it." *Head Money Cases*, 112 U.S. 580, 598 (1884). If a state party breaches a non-self-executing treaty provision, "its infraction becomes the subject of international negotiations and reclamations," and "the judicial courts have nothing to do and can give no redress." *Id.*

## I.  Self-Executing Treaties

### A.  The Doctrine of Self-Execution

Much ink has been spilled on the question of treaty self-execution,[2] which has been called "one of the most confounding in treaty law." *United States v. Postal*, 589 F.2d 862, 876 (5th Cir. 1979). In simple terms, a self-executing treaty is one that is judicially enforceable upon ratification. In contrast, a non-self-executing treaty requires congressional action via implementing legislation or, in some cases, is addressed to the executive branch.

---

[2] *E.g.*, *Al-Bihani v. Obama*, 619 F.3d 1, 9–53 (D.C. Cir. 2010) (Kavanaugh, J., concurring in the denial of reh'g en banc) (providing extensive review on the implications of self-execution); Oona A. Hathaway et al., *International Law at Home: Enforcing Treaties in U.S. Courts*, 37 Yale J. Int'l L. 51, 51–52 (2012) (remarking that the self-execution question is a "deep puzzle" that is "[o]ne of the great challenges for scholars, judges, and practitioners alike").

Nearly a decade ago, the Supreme Court finally brought some clarity to this issue in *Medellín v. Texas*, noting that the "Court has long recognized the distinction between treaties that automatically have effect as domestic law, and those that—while they constitute international law commitments—do not by themselves function as binding federal law" enforceable in domestic courts.  552 U.S. 491, 504 (2008); *see also Bond v. United States*, 134 S. Ct. 2077, 2084 (2014) (recognizing that the Convention on Chemical Weapons "creates obligations only for State Parties and 'does not by itself give rise to domestically enforceable federal law'" (quoting *Medellín*, 552 U.S. at 505 n.2)).

The Supremacy Clause establishes the legal status of all treaties: they are the supreme law of the land, on equal footing with the Constitution and federal statutes.  *See* U.S. Const. art. VI, cl. 2.  But this elevated status does not answer the question whether a treaty may be enforced in domestic courts.  *See United States v. Alvarez-Machain*, 504 U.S. 655, 667 (1992).  Indeed, "[t]he key is to recognize that the question whether a treaty is supreme law is separate from the question whether its provisions create a rule of decision (meaning a rule capable of resolving disputes) for U.S. Courts."  Michael D. Ramsey, *A Textual Approach to Treaty Non-Self-Execution*, 2015 BYU L. Rev. 1639, 1648 (2016).  The Marshall Islands conflates these two issues, arguing that "precedent confirms it 'is emphatically the duty' of the federal courts to interpret the [Treaty], and, because it is a valid law, the Executive 'must' be ordered to comply with it."  This approach skims over the fundamental and threshold inquiry of whether the Treaty is self-executing.

The very idea of non-self-execution might at first seem inimical to both Article III and the Supremacy Clause, which unite to extend "[t]he judicial Power . . . to all Cases . . .

arising under . . . Treaties," U.S. Const. art. III, § 2, cl. 1, and to make "all Treaties . . . the supreme Law of the Land," *id.* art. VI, cl. 2. "[B]ut the power to enforce the law of the land was constitutionally allocated to the courts only in 'cases *of a Judiciary nature*.'" Carlos Manuel Vázquez, *The Four Doctrines of Self-Executing Treaties*, 89 Am. J. Int'l L. 695, 713 (1995) (quoting 2 Records of the Federal Convention of 1787, at 430 (Max Farrand ed., rev. ed. 1966)) (emphasis added). Claims seeking to enforce non-self-executing treaties are thus nonjusticiable precisely because their resolution would exceed the court's "judicial Power." *See* U.S. Const. art. III, § 1.

At its core, the question of self-execution addresses whether a treaty provision is directly enforceable in domestic courts. *Cornejo v. Cty. of San Diego*, 504 F.3d 853, 856 (9th Cir. 2007); Restatement (Fourth) of the Foreign Relations Law of the United States: Treaties § 110 cmt. b (Am. Law Inst., Tentative Draft No. 2, 2017) (draft approved at Annual Meeting on May 22, 2017) ("Restatement") ("When a treaty provision is invoked as a rule of decision in a judicial proceeding, the self-execution inquiry focuses on whether the provision is directly enforceable in court."). When courts are asked to enforce a treaty provision, they must determine whether the provision "addresses itself to the political, not the judicial department." *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829) (Marshall, C.J.), *overruled on other grounds by United States v. Percheman*, 32 U.S. (7 Pet.) 51 (1833). Only if the provision serves as a "directive to domestic courts" may the judiciary enter the fray to enforce it. *Medellín*, 552 U.S. at 508. By contrast, "[a] treaty that is not self-executing . . . is not enforceable in the courts at the behest of anyone, presumably including other nations." Carlos Manuel Vázquez, *Laughing at Treaties*, 99 Colum. L. Rev. 2154, 2179 n.96 (1999).

Because non-self-executing treaty provisions are not judicially enforceable, claims seeking to enforce them are nonjusticiable.

## B.  Article VI is Non-Self-Executing

"The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellín*, 552 U.S. at 506. We may also look to "the negotiation and drafting history of the treaty as well as 'the postratification understanding' of signatory nations" as "aids to . . . interpretation." *Id.* at 507 (citation omitted).  This text-focused approach helps answer the ultimate self-execution question: whether the treaty provision is directly enforceable in domestic courts.

Various textual considerations guide our inquiry, depending on the nature of the provision.  Apart from the Supreme Court's reference to "aids to . . . interpretation," there is no laundry list of factors to consider. *See id.* (citation omitted).  Rather, courts have gleaned interpretive clues from the text and context of treaties. *See Air France v. Saks*, 470 U.S. 392, 397 (1985) (examining "the context in which the written words are used" when construing a treaty).  In addition, the recently adopted Restatement lays out "relevant considerations" for evaluation.[3]

Some treaties reveal their self-execution by expressly calling for direct judicial enforcement.  The Warsaw Convention, which addresses international air travel, provides a well-recognized example. *See* Convention for the

---

[3] Those considerations include "(a) whether the treaty provision is sufficiently precise or obligatory to be suitable for direct application by the judiciary, and (b) whether the provision was designed to have immediate effect, as opposed to contemplating additional measures by the political branches."  Restatement § 110(2).

Unification of Certain Rules Relating to International Carriage by Air art. 28, *opened for signature* Oct. 12, 1929, 49 Stat. 3000, 137 L.N.T.S. 11 (specifying how and where an "action for damages" may be brought against air carriers). Because self-execution is not always so explicit, we also assess whether the treaty's text indicates that the provision would have immediate effect or instead anticipates future action by a political branch. *See Doe v. Holder*, 763 F.3d 251, 255 (2d Cir. 2014). Future-oriented provisions are often non-self-executing because they require another branch to take action within its discretion to implement or honor the treaty obligation. *See, e.g.*, *Sanjaa v. Sessions*, – F.3d –, – (9th Cir. 2017); *Diggs v. Richardson*, 555 F.2d 848, 851 (D.C. Cir. 1976).[4] Another consideration is whether the

---

[4] Although courts often frame this analysis as concerning future *legislative* steps by Congress, this approach is equally applicable to impending *executive* action by the President or the agencies charged with fulfilling a treaty's objectives. *See Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 272–73 (1796) (Iredell, J.) (distinguishing among classes of treaty provisions requiring "execution" by the legislative, executive, and judicial branches). Despite the relative scarcity of cases implicating executive action, there is widespread acknowledgement of this doctrinal parity. *See, e.g.*, Ramsey, *supra*, at 1653 ("Although non-self-execution in this sense is often discussed in connection with directions to Congress, treaty provisions also may be, and commonly are, addressed to the executive branch."); *see also* Curtis A. Bradley, *Intent, Presumptions, and Non-Self-Executing Treaties*, 102 Am. J. Int'l L. 540, 542 (2008) ("There is nothing new about treating future-oriented treaty language that is directed generically at the states parties rather than at their courts as suggestive of non-self-execution."); David Sloss, *Non-Self-Executing Treaties: Exposing a Constitutional Fallacy*, 36 U.C. Davis L. Rev. 1, 21 (2002) (explaining that a treaty provision is non-self-executing if it "obligates a party to accomplish a result in the future, some time after entry into force of the treaty"); Restatement § 110(1) ("Even when a treaty provision is not self-executing, compliance with the provision may be achieved through . . . legislative, executive, administrative, or other action outside the courts.").

treaty provision fails to provide a rule of decision for courts because it contains indeterminate, vague, or aspirational language. *See Doe*, 763 F.3d at 255. Lastly, we must be wary of textual interpretations that would have the judiciary exercise powers constitutionally assigned to another branch; thus, we look for indications of the President's and the Senate's intentions regarding self-execution. *See Medellín*, 552 U.S. at 517, 519, 521. To assist with this textual analysis, we may look to evidence of how the treaty's enforceability was understood both before and after ratification. *Id.* at 507.

Article VI has all the trappings of a non-self-executing treaty provision. The Treaty's text does not explicitly call for direct judicial enforcement of Article VI, and nothing in Article VI suggests that it "was designed to have immediate effect" in domestic courts. *See* Restatement § 110(2). Under Article VI, the United States "undertakes to pursue" future negotiations on "effective measures" to end "the nuclear arms race at an early date" and ultimately "on a treaty on general and complete disarmament." This provision is a prime example of language that offers no "directive to domestic courts" and instead calls for future action by a political branch. *See Medellín*, 552 U.S. at 508.

Foremost, Article VI is addressed to the executive, urging further steps only the executive can take— negotiation with other nations. Even the Marshall Islands appears to recognize as much, admitting that "[t]he text of Article VI placed a legal obligation *upon the Executive* running to" other Treaty parties. Article VI is also addressed implicitly to the Senate because it calls for "a treaty on general and complete disarmament," which would, under the Constitution, require both the President's signature and the Senate's consent. *See* U.S. Const. art. II, § 2, cl. 2 (providing

that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur"). In context, Article VI's use of the phrase "undertakes to pursue," like the phrase "undertakes to comply" in *Medellín*, is "a *commitment* on the part of [the Treaty parties] to take *future* action through their political branches." *See* 552 U.S. at 508 (citation omitted).

Even if Article VI in some sense created an imminent obligation to negotiate in good faith, the essential details of the negotiations—their time, their place, their nature—was unspecified upon ratification. Thus, the provision is "framed as a promise of future action by the member nations." *Fujii v. California*, 242 P.2d 617, 622 (Cal. 1952). That Article VI also calls for satisfactory results "at an early date"— textbook "language of futurity," *see Robertson v. Gen. Elec. Co.*, 32 F.2d 495, 500 (4th Cir. 1929)—only underscores that it is a non-self-executing provision. *See also* Sloss, *supra*, at 24 ("[I]f a treaty obligates the United States to take unspecified steps toward achieving an agreed objective at an unspecified future time . . . then action by the political branches is necessary to execute the treaty.").

Quite apart from Article VI's prospective focus, the provision's indeterminate language does not provide a rule of decision for courts. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803) (Marshall, C.J.) (distinguishing between rules of decision for courts and political questions that involve the exercise of nonjudicial discretion). "[A]s the Supreme Court explained in *Medellín v. Texas*, the absence of mandatory language (i.e., 'must' or 'shall') indicates that a particular provision is not a self-executing directive." *United States v. Bahel*, 662 F.3d 610, 629–30 (2d

Cir. 2011) (citation omitted).[5]  In context, the state parties' meek agreement that they "undertake[] to pursue" good-faith negotiations is at most a hortatory directive, much like the provision at issue in *Medellín*.  *See* 552 U.S. at 500 (interpreting Article 94 of the United Nations Charter, which provides that each state "undertakes to comply with the decision[s]" of the International Court of Justice).

Article VI is also chock-full of vague terms that do not "provide specific standards" for courts to apply.  *See Diggs*, 555 F.2d at 851.  For example, it calls for negotiations on "effective measures" to cease the nuclear arms race and achieve disarmament, yet what constitutes "effective" is in the eyes of nuclear experts and negotiators.  "[T]he use of the nebulous term 'effective'—which is never defined in the treaty—further demonstrates that Article [VI] is not a 'directive to domestic courts' that 'by itself give[s] rise to domestically enforceable federal law.'"  *Sanjaa*, – F.3d at – (third alteration in original) (quoting *Medellín*, 552 U.S. at 505 n.2, 508).  Although the Treaty's goal of universal nuclear disarmament may be clear, the path to achieving it is perilously uncertain.  *See* Carlos Manuel Vázquez, *Four Problems with the Draft Restatement's Treatment of Treaty Self-Execution*, 2015 BYU L. Rev. 1747, 1750 (2016) (pointing to "treaties that require parties to use their best

---

[5] A provision that is "absolute and mandatory" is more likely self-executing, *Smith v. Canadian Pac. Airways, Ltd.*, 452 F.2d 798, 801 (2d Cir. 1971), because there is no need for precise and obligatory treaty language "to be supplemented by legislative or executive action," *Commonwealth v. Hawes*, 76 Ky. (13 Bush) 697, 702–03 (1878).  But when a treaty provision is "phrased in broad generalities," *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 374 (7th Cir. 1985) (per curiam), it often leaves the political branches with discretion that is not the court's to exercise.

efforts to accomplish certain goals" as examples of those "too vague for judicial enforcement").

Likewise, Article VI's hopeful plea for successful negotiations to culminate "at an early date" is not indicative of self-execution.  Nor is the Marshall Islands' position bolstered by the Treaty's preamble, in which the state parties "[d]eclar[e]" their "intention" to end the arms race "at the earliest possible date" and to move "in the direction of nuclear disarmament."  "Aspirational language is the hallmark of a non-self-executing treaty . . . ." *Doe*, 763 F.3d at 255.  Article 34 of the Refugee Convention, for example, provides that state parties "shall as far as possible facilitate the assimilation and naturalization of refugees."  *INS v. Stevic*, 467 U.S. 407, 417 (1984) (citation omitted).  The Supreme Court had no trouble concluding that this provision was "precatory and not self-executing."  *Id.* at 429 n.22.[6] The same can be said about Article VI.  Indeed, the provision's wishful tenor reflects the reality of the Treaty

---

[6] *See also Igartúa-De La Rosa v. United States*, 417 F.3d 145, 150 (1st Cir. 2005) (en banc) (explaining that treaties often "contain[] highly general and ramifying statements" that are "merely aspirational and not law in any sense"); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 809 (D.C. Cir. 1984) (Bork, J., concurring) (explaining that Articles 1 and 2 of the U.N. Charter "contain general 'purposes and principles,' some of which state mere aspirations and none of which can sensibly be thought to have been intended to be judicially enforceable"); Michael P. Van Alstine, *The Judicial Power and Treaty Delegation*, 90 Cal. L. Rev. 1263, 1273 (2002) ("Some non-self-executing treaties, for example, may be merely precatory or otherwise too vague for judicial enforcement."); Vázquez, *The Four Doctrines of Self-Executing Treaties*, *supra*, at 712 ("'Precatory' treaty provisions are deemed judicially unenforceable . . . because what the parties agreed to do is considered, in our system of separated powers, a 'political' task not for the courts to perform.").

itself: the state parties could agree only that they hoped to usher in a nuclear-free future.

Article VI also has a key hallmark of non-self-execution because the "consequences" of permitting enforcement by domestic courts, especially in the manner urged by the Marshall Islands, would implicate grave constitutional concerns that should "give [us] pause." *See Medellín*, 552 U.S. at 517.  A provision cannot be judicially enforced if doing so would compel the courts to assume a role constitutionally assigned to the executive or the legislature.[7] There is perhaps nothing more prototypically political than the negotiation of a multilateral international instrument. Deciding when, where, and whether to negotiate with foreign nations is within the exclusive authority of the executive.  *See generally* U.S. Const. art. II, §§ 2, 3 (assigning the President powers over foreign affairs). Granting the Marshall Islands' requested relief would essentially appoint the district court as a Special Master overseeing the United States' nuclear treaty negotiations.  To construe Article VI as self-executing and approve the

---

[7] *See* Restatement § 110(3) ("Courts will also regard a treaty provision as non-self-executing to the extent that implementing legislation is constitutionally required."); Vázquez, *Laughing at Treaties*, *supra*, at 2180 ("[P]erhaps a court could legitimately construe the Constitution to place treaties concerning certain subjects—arms control, for example—beyond the enforcement power of the courts."); Vázquez, *The Four Doctrines of Self-Executing Treaties*, *supra*, at 717 ("It may even be that certain treaties are not judicially enforceable under our Constitution because they bear too closely on national security or are otherwise too sensitive for judicial involvement.  A claim that an arms control agreement requires the United States to dismantle weapons, for example, might be nonjusticiable on this ground even if the agreement is neither precatory nor vague.").

Marshall Islands' claims would thus violate core separation-of-powers principles.

Last but not least, nothing about Article VI suggests that the President and the Senate intended it to be enforceable in domestic courts. A "treaty that does not evince such executory intentions is non-self-executing." *Cardenas v. Stephens*, 820 F.3d 197, 202 n.5 (5th Cir. 2016); *see also Medellín*, 552 U.S. at 519, 521. Even if we look beyond the text of Article VI itself, there is no hint that domestic enforcement was envisioned. The Treaty's preamble notes the "intention" of the parties to accomplish nuclear disarmament, towards which the "cooperation of all States" is "[u]rg[ed]." But the Treaty is "silent as to any enforcement mechanism" in the event of noncompliance. *See Medellín*, 552 U.S. at 508. That silence is significant in the context of this treaty and this lawsuit, not least because, in the absence of a specific treaty directive, having states open their domestic courts to other treaty parties would be extraordinary. *See* Woolhandler, *supra*, at 765 ("[F]oreign nations were generally unable to sue in United States courts to enforce general treaty obligations. Indeed, they rarely if ever tried." (footnote omitted)); *cf. The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 137 (1812) (Marshall, C.J.) ("One sovereign being in no respect amenable to another; and being bound by obligations of the highest character not to degrade the dignity of his nation, by placing himself or its sovereign rights within the jurisdiction of another . . . .").

Preratification evidence confirms our interpretation of the text. Although the parties have not enlightened us to any specific intentions of President Johnson or President Nixon, contemporaneous testimony tells us something about the Senate's views on the subject. Senator Fulbright, then-

Chairman of the Senate Foreign Relations Committee, implied that the entire Treaty was unenforceable as he exhorted his colleagues to give their consent during the ratification debate. *See* 115 Cong. Rec. 6198, 6199–6200, 6204–05 (1969). When pressed on what might happen if the United States breached the Treaty, he replied that, "since we do not belong to a world of law but only of the jungle law, the effect of [breach] would be the same as withdrawal" from the Treaty "because nobody is going to be able to enforce the [T]reaty against us." *Id.* at 6199. He continued to reassure his fellow senators: "A treaty may create certain obligations in the mind of a foreign country, but domestically it does not." *Id.* at 6204.[8] Senator Fulbright's testimony does not "convey[] an intention" that either the Treaty generally, or Article VI specifically, are self-executing or were "ratified on these terms." *See Medellín*, 552 U.S. at 505 (quoting *Igartúa-De La Rosa*, 417 F.3d at 150).

The postratification history is consistent with these contemporaneous comments on the Treaty. Following the Treaty's ratification, Congress explicitly provided that "[t]he Secretary of State, under the direction of the President, shall have primary responsibility for the preparation, conduct, and

---

[8] Senator Fulbright's colloquy with his colleague, Senator Tower, continued in quite amusing terms. When Senator Tower pushed on whether the Treaty would prevent the United States from acting in a crisis to transfer nuclear weapons to an ally, Senator Fulbright again placated him: "Then, we just violate the [T]reaty." 115 Cong. Rec. at 6199. This led Senator Tower to ask whether Senator Fulbright "[wa]s proposing that if we think it necessary, we should treat the [T]reaty as a scrap of paper?" *Id.* Senator Fulbright conceded that he was. *See id.* After further questioning, he concluded that the Treaty "does not impose any real restrictions on the nuclear powers" like the United States. *Id.* This dismissive view of the Treaty, which strongly supports the principle that its provisions are non-self-executing, is, of course, legally incorrect vis-à-vis the Supremacy Clause.

management of United States participation in all international negotiations and implementation fora in the field of arms control, nonproliferation, and disarmament." *See* 22 U.S.C. § 2574(a). "In furtherance of these responsibilities," Congress granted the President power to appoint representatives to conferences and activities "relat[ed] to the field of nonproliferation, such as the preparations for and conduct of the review relating to the Treaty on the Non-Proliferation of Nuclear Weapons." *Id.* In short, the political branches have worked hand in hand to fulfill the United States' obligations under Article VI—and they have done so without giving the slightest hint that the judiciary should play a Big Brother role by supervising negotiations. That same legislation requires the President and the Secretary of State to submit a report to *Congress* that details the United States' "adherence . . . to obligations undertaken in arms control, nonproliferation, and disarmament agreements" and "any ongoing . . . negotiations." 22 U.S.C. § 2593a(a)(2)–(3).

Similarly, ongoing Treaty review conferences have given no indication that the United States or other state parties contemplate any domestic enforcement mechanism for alleged Article VI violations. In fact, state parties have specifically indicated that "responses to concerns over compliance with any obligation under the Treaty by any State party should be pursued *by diplomatic means*." 2010 Review Conference of the Parties to the Treaty on the Non-Proliferation of Nuclear Weapons, Final Document, pt. I, p. 3 ¶ 7, *available at* https://www.nonproliferation.org/wp-content/uploads/2015/04/2010_fd_part_i.pdf (emphasis added). And in conjunction with a 1990 Treaty review conference, the Senate agreed to a concurrent resolution to reaffirm support for the Treaty's objectives only after Senator Boschwitz, the resolution's sponsor, affirmed that

the Treaty "is not self-executing."  136 Cong. Rec. 12,723 (1990).  Although this congressional interpretation reflects the view of only a single member of Congress, it accords with the executive's present position, to which we give "great weight."  *See Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982).

The Marshall Islands would have us ignore the self-execution question entirely, asserting that it is "[i]rrelevant" because Article VI creates "direct rights" that run from one treaty party to another and does not "concern[] alleged third-party treaty rights."  Standing alone, this statement is partially true—the Treaty lays out obligations that run between treaty parties.  But this approach evades the threshold issue of *where* and *how* these asserted "rights"— direct or otherwise—may be enforced.  Article VI, as a treaty provision for which no domestic enforcement was explicitly or implicitly contemplated, does not provide a basis for justiciable claims in federal court.[9]

## II.  Redressability

Having done the analytical heavy-lifting in addressing Article VI's status as a non-self-executing provision, we turn briefly to a related reason that the Marshall Islands' claims

---

[9] We mention two issues that we need not address.  First, though some courts have observed "an emerging presumption against finding treaties to be self-executing," *ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 387 (4th Cir. 2012), we express no view on such a presumption here.  Second, we note that the questions whether a treaty provision is self-executing, creates private rights, or provides a private right of action are distinct, *see generally* Hathaway, *supra*, at 56–57 ("disentangl[ing]" the three concepts); *Medellín*, 552 U.S. at 506 n.3 (distinguishing the issue of self-execution and private rights of action), and we need answer only the first one here.

are nonjusticiable: under standing analysis, the asserted injuries are not redressable. Like the concept of self-execution, the standing requirement springs "[f]rom Article III's limitation of the judicial power to resolving 'Cases' and 'Controversies,' and the separation-of-powers principles underlying that limitation." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014). To establish standing, a plaintiff must show injury in fact, causation, and redressability. *See id.* Although the parties and *amici* devote much attention to whether the Marshall Islands established injury in fact, we need not go down that road. Lack of redressability alone deprives the Marshall Islands of standing.

Simply put, the asserted injuries are not redressable because Article VI may not be enforced in federal court. "Redressability requires an analysis of whether the court has the power to right or to prevent the claimed injury." *Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982) (Kennedy, J.). Even assuming that the Marshall Islands has suffered injury in fact, the federal courts have no power to right or to prevent that injury. *See id.* When a state party violates a non-self-executing treaty provision, "the judicial courts have nothing to do and can give no redress." *Head Money Cases*, 112 U.S. at 598.[10]

---

[10] The Marshall Islands bemoans the district court's failure to analyze its claims for declaratory relief separately for standing purposes. Because the Declaratory Judgment Act does not create new substantive rights but instead "presupposes the existence of a judicially remediable right," invocation of the Act does not permit the Marshall Islands to dodge the redressability question. *See Schilling v. Rogers*, 363 U.S. 666, 677 (1960); *see also Igartúa-De La Rosa*, 417 F.3d at 149 (denying declaratory relief because treaty provisions were not self-executing).

### III. Political Question Doctrine

As with self-execution and redressability in the context of treaty enforcement, "[t]he nonjusticiability of a political question is primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 210 (1962). The Marshall Islands' claims present inextricable political questions that are nonjusticiable and must be dismissed. *See Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 977 (9th Cir. 2007).

It is well settled that not all cases involving foreign relations raise political questions. *See Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 229–30 (1986). However, the Supreme Court has recognized that decisions concerning foreign relations are often inherently political: "Not only does resolution of such issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand single-voiced statement of the Government's views." *Baker*, 369 U.S. at 211 (footnotes omitted). It should be no surprise that the self-execution inquiry in treaty cases will frequently track the analysis of whether the claims raise political questions.

To determine if a particular claim raises a political question, courts generally consider whether the claim involves:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for

nonjudicial    discretion;    or    [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of    embarrassment    from    multifarious pronouncements by various departments on one question.

*Id.* at 217 (listing the "*Baker* factors"). We have characterized the first three factors as "constitutional limitations of a court's jurisdiction" and the other three factors as "prudential considerations." *Corrie*, 503 F.3d at 981 (citation omitted). The inquiry requires a "case-by-case analysis" in which the various *Baker* factors "often collaps[e] into one another." *Alperin v. Vatican Bank*, 410 F.3d 532, 544–45 (9th Cir. 2005). Still, "[t]o find a political question, we need only conclude that one factor is present, not all." *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005).

The district court relied on the first two *Baker* factors, and we primarily do the same. Indeed, we have recognized that the first two are likely the most important. *See Alperin*, 410 F.3d at 545. Under the first factor, the Marshall Islands' claims involve "a textually demonstrable constitutional commitment of the issue to a coordinate political department," *Baker*, 369 U.S. at 217—namely, the decision of when, where, whether, and how the United States will negotiate with foreign nations to end the nuclear arms race and accomplish nuclear disarmament. *See* U.S. Const. art.

II, §§ 2, 3.[11]  "The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision."  *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918).  We simply cannot square "the 'primacy of the Executive in the conduct of foreign relations' and the Executive Branch's lead role in foreign policy," *Taiwan v. U.S. Dist. Court for the N. Dist. of Cal.*, 128 F.3d 712, 718 (9th Cir. 1997) (citation omitted), with an injunction that compels the United States to "*call[] for and conven[e]* negotiations for nuclear disarmament in all its aspects."

The second *Baker* factor offers an additional impediment: the "lack of judicially discoverable and manageable standards for resolving" key issues inextricably intertwined with the relief the Marshall Islands seeks.  *See Baker*, 369 U.S. at 217.  As we have said, Article VI contains an array of vague terms and a dearth of applicable standards. Our self-execution analysis applies with equal force under this *Baker* factor.  *See generally* Carlos Manuel Vázquez, *Treaties as Law of the Land: The Supremacy Clause and the Judicial Enforcement of Treaties*, 122 Harv. L. Rev. 599, 631 (2008) (explaining that treaties that are non-self-executing because they are "too vague for judicial enforcement" are "no different from constitutional and

---

[11] These foreign-relations judgments also implicate the third *Baker* factor, because they require "an initial policy determination of a kind clearly for nonjudicial discretion."  *See Baker*, 369 U.S. at 217; *see also Bancoult v. McNamara*, 445 F.3d 427, 437 (D.C. Cir. 2006) ("The courts may not bind the executive's hands on [political questions], whether directly—by restricting what may be done—or indirectly—by restricting how the executive may do it.").

statutory provisions that are regarded as nonjusticiable" under the political question doctrine).

The Marshall Islands and *amici* seek to narrow the scope of our inquiry by focusing only on the part of the complaint that concerns the United States' obligation to negotiate in "good faith," a term they argue is frequently applied by courts in other contexts, such as labor negotiations. This surgical attempt would read that term in isolation and out of context. The question is not just what constitutes "good faith," but also what measures are "effective," what qualifies as the "cessation" of the nuclear arms race, what counts as "an early date," and even what it means to "pursue" these kinds of complex and multilateral negotiations. *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) (en banc) ("The political question doctrine bars our review of claims that, regardless of how they are styled, call into question the prudence of the political branches in matters of foreign policy or national security constitutionally committed to their discretion."). Here, only a second's thought brings embedded political questions to the surface, and the remaining *Baker* factors also counsel in favor of demurring.

**AFFIRMED.**