FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| M.S., an individual; V.V., an individual; J.H., an individual; E.D., an individual; M.B., an individual; FAMILIAS EN ACCION, a domestic non-profit corporation; LOS NINOS CUENTAN, a domestic non-profit corporation, on behalf of themselves and all those similarly situated, *Plaintiffs-Appellants*, <br><br> v. <br><br> KATE BROWN, in her official capacity as Governor of the State of Oregon; TAMMY BANEY, in her official capacity as Chair of the Oregon Department of Transportation Commission; DAVID LOHMAN, in his official capacity as member of the Oregon Department of Transportation Commission; SUSAN MORGAN, in her official capacity as member of the Oregon Department of Transportation Commission; ALANDO SIMPSON, in his official capacity as member of the Oregon Department of Transportation Commission; SEAN O'HALLORAN, in his official capacity | No. 16-35431 <br><br> D.C. No. 6:15-cv-02069-AA <br><br><br> OPINION |

as member of the Oregon
Department of Transportation
Commission; MATTHEW L.
GARRETT, in his official capacity as
Director, Oregon Department of
Transportation; TOM MCCLELLAN, in
his official capacity as Administrator
of Driver and Motor Vehicles
Division, Oregon Department of
Transportation,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, District Judge, Presiding

Argued and Submitted May 17, 2018
Portland, Oregon

Filed September 5, 2018

Before:  A. Wallace Tashima, M. Margaret McKeown,
and Richard A. Paez, Circuit Judges.

Opinion by Judge Paez

# SUMMARY[*]

## Civil Rights

The panel affirmed the district court's dismissal, for lack of subject matter jurisdiction, of an action brought under 42 U.S.C. § 1983 against various Oregon state officials challenging the rejection by Oregon voters of Senate Bill 833, which would have afforded Oregon residents access to driver cards without requiring proof of their legal presence in the United States.

Plaintiffs alleged that voters' rejection, by referendum through ballot Measure 88, of SB 833 was motivated by discriminatory animus, and that the state officials' consequent refusal to issue driver cards violated their Fourteenth Amendment rights to equal protection and due process. Plaintiffs sought (1) a declaration that Measure 88 violates their constitutional rights and was void and unenforceable; (2) a declaration that the Governor was authorized and required to issue driver cards pursuant to SB 833; and (3) an injunction, if necessary to enforce such declarations.

The panel held that because plaintiffs' requested remedies were either ineffective or beyond the scope of the district court's remedial power, plaintiffs failed to establish redressability. Accordingly, the district court did not err in dismissing the complaint for lack of standing. The panel held that except in certain circumstances not applicable in this case, structural constitutional limits prevent federal

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

courts from ordering government officials to enact or implement a bill that has not completed a lawfully prescribed legislative process—which, in Oregon, requires majority voter approval once a bill is properly referred to a referendum. Plaintiff did not allege that the initial referral of SB 833 to the voters was improper in any way. Instead, plaintiffs challenged only the voters' rejection of Measure 88 and the Governor's subsequent decision to abide by the result of the referendum election. The panel concluded that the legislative process for SB 833 to become law remained incomplete, and the district court could not issue declaratory relief authorizing and requiring the Governor to implement it.

## COUNSEL

David Henretty (argued), Monica Goracke, and Stephen S. Walters, Oregon Law Center, Portland, Oregon, for Plaintiffs-Appellants.

Jona J. Maukonen (argued) and Susan Yorke, Assistant Attorneys General; Benjamin Gutman, Solicitor General; Ellen F. Rosenblum, Attorney General; Office of the Attorney General, Salem, Oregon; for Defendants-Appellees.

Michael M. Hethmon, Senior Counsel; Dale L. Wilcox, Executive Director & General Counsel; Immigration Reform Law Institute, Washington, D.C.; for Amicus Curiae Oregonians for Immigration Reform.

**OPINION**

PAEZ, Circuit Judge:

The Oregon Constitution grants the people of Oregon the power of referendum to approve or reject bills passed by the Oregon Legislature before they become law. In 2014, the people exercised this power by rejecting Senate Bill 833 ("SB 833"), which would have afforded Oregon residents access to driving privileges through the issuance of driver cards without requiring proof of their legal presence in the United States.

Plaintiffs, five Oregon residents who cannot prove their legal presence and two non-profit corporations, subsequently brought this action under 42 U.S.C. § 1983 against various state officials who are responsible for the issuance of Oregon driver's licenses. Plaintiffs allege that the voters' rejection of SB 833 was motivated by discriminatory animus, and that the state officials' consequent refusal to issue driver cards violates their Fourteenth Amendment rights to equal protection and due process. Plaintiffs do not, however, challenge the initial invocation of the referendum power, which suspended the future operation of SB 833 pending voter approval.

In the context of this unchallenged and ongoing suspension of the bill's operation, the district court dismissed the plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(1) for lack of Article III standing. In particular, the court concluded that plaintiffs failed to establish the redressability element of standing because the court could not order the state officials to implement SB 833 and thus issue driver cards. On the circumstances presented here, we agree with the district court that it cannot provide redress for plaintiffs' claimed injury, their inability to obtain

or renew driving privileges. Accordingly, we affirm the district court's dismissal for lack of subject matter jurisdiction.

## I.

### A.

The facts of this case can be traced to the enactment of the REAL ID Act of 2005, Pub. L. No. 109-13 (codified in scattered sections Title 8 of the U.S. Code). When the REAL ID Act was enacted, the State of Oregon did not require its residents to prove their legal presence in the United States to obtain driver's licenses. The REAL ID Act, however, altered this framework by providing that, effective May 2008, states must require individuals to prove their legal presence in the United States to obtain any documents that serve as a form of federally approved identification, including driver's licenses. 49 U.S.C. § 30301 note. The REAL ID Act allows states to issue documents conferring driving privileges regardless of immigration status as long as such documents are distinguishable from driver's licenses and other federally approved identification cards. *Id.*

To comply with the requirements of the REAL ID Act, the Oregon Legislature enacted SB 1080 in February 2008. SB 1080 requires applicants for driver's licenses to prove their legal presence in the United States. Or. Rev. Stat. § 807.021(1). Pursuant to SB 1080, the Oregon Department of Motor Vehicles ("DMV") stopped granting—and presently refuses to grant—driver's licenses to Oregon residents who are unable to prove their legal presence in the United States.

In April 2013, majorities in both chambers of the Oregon Legislature voted to enact SB 833, the bill at issue in this

case, which would restore access to driving privileges for Oregon residents who cannot prove their legal presence in the United States.[1] In particular, SB 833 would authorize state officials to issue limited-use "driver cards" consistent with the REAL ID Act. As one of SB 833's sponsors stated during a floor debate in the Oregon House, the main purpose of SB 833 was to "improve traffic safety and[] reduce the number of unlicensed, uninsured drivers on Oregon's roads." The governor signed the bill on May 1, 2013, and it was set to take effect on January 1, 2014.

One week after the governor signed SB 833, however, two legislators who had opposed the bill and a third person filed a petition to refer it as a ballot measure to a state-wide referendum for approval or rejection by the people pursuant to article IV, section 1(3)(a) of the Oregon Constitution.[2] In October 2013, the Oregon Secretary of State determined that the petition had received the requisite number of signatures for such referral, and designated SB 833 as Measure 88 for the November 2014 election.[3]

---

[1] The bill passed by a vote of 20 to 7 in the Oregon Senate and by a vote of 38 to 20 in the Oregon House.

[2] In Oregon, the Legislature may refer a bill to the people for a referendum election, or, as was the case here, the bill may be referred by a petition receiving signatures amounting to at least four percent of the total votes cast at the preceding gubernatorial election. Or. Const. art. IV, § 1(3)(b)–(c). Once a bill is referred to the people, its effect is stayed pending majority approval at the referendum. *See infra* pp. 14–16. Throughout this opinion, except when quoting the parties, we use "SB 833" to refer to the driver card bill prior to its referral to the people, and "Measure 88" to refer to the driver card ballot measure.

[3] *See Initiative, Referendum, and Referral Search*, Or. Sec'y of State, Elections Div., http://egov.sos.state.or.us/elec/web_irr_search.rec

As documented in the Official 2014 General Election Voter's Pamphlet, the ensuing Measure 88 campaign was motivated by efforts to curb "illegal immigration" and prevent "illegal immigrants" from obtaining or renewing their driving privileges.  Similar statements singling out "illegal aliens" were made in other public settings, including a "Protect Oregon Driver Licenses" webpage set up by a group of driver card opponents in May 2013.  In addition, statements in the Official 2014 General Election Voter's Pamphlet denounced the "Mexican" consular ID as a possible form of identification; the possibility of increased activity by "Mexican" drug cartels; and the "flood" and "surge" of "Central American minors to our southern border."  Opposition statements did not mention immigrants of any other race or nationality.

On November 14, 2014, 66% of Oregon voters at the referendum election voted "No" on Measure 88, thus rejecting SB 833.  As a result, SB 833 never became effective, and the State has not issued driver cards.

## B.

In November 2015, individuals M.S., V.V., J.H., E.D., and M.B. and non-profit corporations Familias en Acción and Los Niños Cuentan (collectively, "M.S.") brought this putative class action under 42 U.S.C. § 1983 against Governor Kate Brown and various other state officials in their official capacities (collectively, "the Governor").[4]

---

ord_detail?p_reference=20140301.LSCYYY (last accessed July 24, 2018).

[4] In addition to Governor Brown, the defendants are Tammy Baney, Chair of the Oregon Department of Transportation ("ODOT"); David Lohman, Susan Morgan, Alando Simpson, and Sean O'Halloran,

M.S., an Oregon resident who is unable to prove her legal presence in the United States, alleges two violations of the Equal Protection Clause and one violation of her substantive due process rights. In particular, she alleges that the voters' rejection of Measure 88 and the Governor's consequent refusal to issue driver cards are unconstitutional because the referendum result was motivated by animus towards Mexicans and Central Americans and not rationally related to a legitimate state interest.[5] M.S. does not, however, allege that the referral of SB 833 to the voters was itself unconstitutional or otherwise improper.[6]

In May 2016, the district court granted the Governor's motion to dismiss the complaint pursuant to Rule 12(b)(1) on the basis that M.S. failed to establish the redressability element of Article III standing. The court noted at the outset that M.S. was not challenging "the referendum process associated with Measure 88 or any State action taken with

---

members of the ODOT Commission; Matthew Garrett, Director of ODOT; and Tom McClellan, Administrator of DMV.

[5] The complaint alleges that the "enactment of Measure 88" was unconstitutional and requests, inter alia, a declaration to invalidate "Measure 88." The district court understood these statements in the complaint to be directed at the *voters' rejection of Measure 88*, rather than Measure 88 itself, because Measure 88—which was simply what SB 833 became after it qualified for the referendum election—never became law, and had it become law, it would have afforded M.S. the very access to driving privileges she now seeks. *M.S. v. Brown*, 222 F. Supp. 3d 908, 910 n.3 (D. Or. 2016). As the parties have not challenged the district court's construction on appeal, we adopt it here.

[6] At oral argument, M.S. confirmed that she was not pursuing such a challenge. *See* United States Court of Appeals for the Ninth Circuit, 16-35431 *M.S.v. Brown*, YouTube (May 17, 2018) at 5:20–5:52.

respect to the referendum election." "Rather," M.S. was challenging "only the voters' rejection of Measure 88—and, by extension, of SB 833—and the State's alleged refusal to implement SB 833 as a result of the referendum." The district court then reasoned that "even if [it] found the rejection of Measure 88 to be unconstitutional, SB 833 would not become law" because Measure 88 did not receive the majority voter approval required under the Oregon Constitution once SB 833 was properly referred to the people for a referendum vote. The district court further reasoned that "[p]rinciples of federalism underlying the Tenth and Eleventh Amendments forbid [it] from directing the State to enact or enforce state laws." Thus, the district court concluded, M.S. failed to establish the redressability element of standing.[7] *M.S. v. Brown*, 222 F. Supp. 3d 908, 914 (D. Or. 2016).

M.S. timely appealed.

## II.

Reviewing de novo the district court's dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction, *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 963 (9th Cir. 2018), we conclude that M.S. lacks Article III standing to sue. We begin by reviewing relevant principles of standing. Applying those principles, we then consider whether M.S.'s claimed injury—her inability to obtain or

---

[7] The district court also concluded that M.S. failed to establish the causation element of standing. *Brown*, 222 F. Supp. 3d at 914 n.5. The court reasoned that the defendants were not "refusing to issue driver cards because a referendum motivated by discriminatory animus *prevents* them from doing so; they cannot issue driver cards because no valid, existing Oregon law *authorizes* them to do so." *Id.* at 914.

renew driving privileges—is redressable through a favorable judicial decision. Because each of M.S.'s requested remedies is either ineffective or beyond the scope of the district court's remedial power, M.S. fails to establish redressability. Accordingly, the district court did not err in dismissing the complaint for lack of standing.[8]

## A.

The doctrine of standing is rooted in the "Cases or Controversies" clause of Article III of the Constitution. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To establish standing, a plaintiff must demonstrate a "personal stake in the outcome of the controversy," *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)), thus "ensur[ing] that the Federal Judiciary respects 'the proper—and properly limited—role of the courts in a democratic society,'" *id.* (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)). "We enforce that requirement by insisting that a plaintiff satisfy the familiar three-part test for Article III standing: that he '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Id.* (quoting *Spokeo*, 136 S. Ct. at 1547).

Most relevant here is the third prong of Article III standing, redressability. To establish redressability, a plaintiff must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561

---

[8] In light of our conclusion that there is no redressability, we do not reach the injury-in-fact or causation elements of standing, and we do not pass upon the merits of M.S.'s claims.

(1992) (internal quotation marks omitted). A plaintiff's burden to demonstrate redressability is "relatively modest." *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) (quoting *Bennett v. Spear*, 520 U.S. 154, 171 (1997)). She "need not demonstrate that there is a 'guarantee' that [her] injuries will be redressed by a favorable decision," *id.* (quoting *Graham v. FEMA*, 149 F.3d 997, 1003 (9th Cir. 1998); rather, a plaintiff need only "show a 'substantial likelihood' that the relief sought would redress the injury," *Mayfield v. United States*, 599 F.3d 964, 971 (9th Cir. 2010). If, however, a favorable judicial decision would not require the defendant to redress the plaintiff's claimed injury, the plaintiff cannot demonstrate redressability, *see, e.g.*, *Mayfield*, 599 F.3d at 971, unless she adduces facts to show that the defendant or a third party are nonetheless likely to provide redress as a result of the decision, *see Lujan*, 504 U.S. at 562.

Finally, even where a plaintiff requests relief that would redress her claimed injury, there is no redressability if a federal court lacks the power to issue such relief. *See Republic of Marshall Islands v. United States*, 865 F.3d 1187, 1199 (9th Cir. 2017) ("Redressability requires an analysis of whether the court *has the power* to right or to prevent the claimed injury." (emphasis added) (quoting *Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982) (Kennedy, J.))). When determining the extent of the district court's remedial power for purposes of redressability, we "assume that [the] plaintiff's claim has legal merit." *Bonnichsen v. United States*, 367 F.3d 864, 873 (9th Cir. 2004). However, not all meritorious legal claims are redressable in federal court. *See, e.g.*, *Republic of Marshall Islands*, 865 F.3d at 1199 ("When a state party violates a non-self-executing treaty provision, 'the judicial courts have nothing to do and can give no redress.'" (quoting *Head*

*Money Cases*, 112 U.S. 580, 598 (1884))). This is so even where, as here, a plaintiff alleges constitutional violations. *See, e.g.*, *Connor v. Williams*, 404 U.S. 549, 550–51 (1972); *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). With these principles in mind, we turn to the remedies at issue in this case.

**B.**

We conclude that M.S. has failed to establish redressability because she seeks only remedies that would not be substantially likely to redress her claimed injury, *see Mayfield*, 599 F.3d at 971, or which are beyond the district court's remedial power to issue, *see Republic of Marshall Islands*, 865 F.3d at 1199. In particular, M.S. seeks to redress her claimed injury—her inability to obtain or renew driving privileges—through the following remedies: (1) a declaration "that Measure 88 violates [her constitutional rights] and is void and unenforceable"; (2) a declaration that the Governor is "authorized and required to issue driver cards pursuant to SB 833"; and (3) "[a]n injunction, if necessary," to enforce such declarations. We address each requested remedy in turn. *See, e.g.*, *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 815 (9th Cir. 2017).

**1.**

M.S. first requests a "declaration that Measure 88 violates [her] rights under the Equal Protection and Due Process Clauses . . . , and is void and unenforceable." We construe this request to be directed at the voters' rejection of Measure 88, rather than Measure 88 itself. *See supra* note 5. Therefore, the question before us is whether M.S.'s inability to obtain or renew driving privileges is redressable through a declaration that the voters' rejection of Measure 88 violated her constitutional rights, and is void and

unenforceable. M.S. asserts that such a declaration would render SB 833 effective under Oregon law, thus enabling her to access driving privileges and redressing her claimed injury. In response, the Governor argues that majority voter approval is necessary to effectuate SB 833, and therefore state officials would not be required—indeed, would not have the statutory authority—to issue driver cards even if the declaration were issued. We agree with the Governor.

The Oregon Constitution provides that the people retain the referendum power to approve or reject legislation enacted by the Oregon Legislature before it goes into effect. Or. Const. art. IV, § 1(3)(a). Once a bill is referred to the people for a referendum vote, the resulting "referendum measure becomes effective 30 days after the day on which it is . . . approved by a majority of the votes cast thereon." Or. Const. art. IV, § 1(4)(d). "When a referendum is invoked, the act of the legislature then becomes merely a measure to be voted on by the people, and, if the people vote in the affirmative, the measure becomes an act; if they vote in the negative, the measure fails." *Portland Pendleton Motor Transp. Co. v. Heltzel*, 255 P.2d 124, 125 (Or. 1953) (en banc). "In fact, the measure enacted by the Legislature, which is referred to the people, is not a law. *It will never become a law unless a majority of voters voting upon the referred bill vote in favor of the bill.*" *Davis v. Van Winkle*, 278 P. 91, 92 (Or. 1929) (en banc) (emphasis added).

M.S. argues that majority voter approval is not required to implement SB 833 in light of a 1968 amendment to the Oregon Constitution, which abrogated the above statements to the contrary in *Heltzel* and *Davis*. We disagree. The amendment in question revised article IV, section 1 of the Oregon Constitution by, inter alia, removing the text, "Any measure referred to the people shall take effect and become

the law when it is approved by a majority of the votes cast thereon, and not otherwise," and inserting the current language, "[A] . . . referendum measure becomes effective 30 days after the day on which it is . . . approved by a majority of the votes cast thereon."[9] A legislative committee explanation accompanying the amendment provided, in relevant part, that the amendment "would remove archaic and redundant language from existing section 1a, Article IV. . . . These repealed sections are purely 'clean-up' of the wording and in no way do they diminish the power of the people to initiate or refer measures." Dist. Ct. Dkt. No. 43, Ex. B at 2; *see also Stranahan v. Fred Meyer, Inc.*, 11 P.3d 228, 241 (Or. 2000) ("[T]he 1968 amendment did not purport to alter the nature of the people's power of initiative and referendum, which had been in existence since 1902."). Thus, the 1968 amendment does not support M.S.'s argument than an unconstitutional "no" vote on Measure 88 has the same effect as a valid "yes" vote under Oregon law. To the contrary, the legislative committee explanation for the amendment cuts against M.S.'s argument by clarifying that the substantive force of the pre-amendment text—which plainly states that a referendum measure shall take effect upon majority voter approval "*and not otherwise*" (emphasis added)—did not diminish as a result of the amendment.

In light of the current validity of this majority voter approval requirement, we conclude that the requested

---

[9] The pre-1968 amendment version of the Oregon Constitution is recorded in the Oregon Blue Book at 162, Or. Sec'y of State (1965–66); the text of the amendment and accompanying ballot materials are contained in the State of Oregon Voters' Pamphlet at 8–11, Democratic Party (May 28, 1968); and both of the foregoing sources are attached to the declaration of Oregon Assistant Attorney General Sarah Weston in support of the State's Reply In Support of Motion to Dismiss. *See* Dist. Ct. Dkt. No. 43.

declaration does not establish redressability. After the Oregon Legislature initially "enacted" SB 833, the Act was referred to the people for a referendum vote prior to its taking effect. M.S. does not challenge the legality of that referral. Once referred to the people, SB 833 was "again reduced to a bill," *Davis*, 278 P. at 92, or "merely a measure," *Heltzel*, 255 P.2d at 125. Even if Measure 88 also remained an "Act" or "statute," as M.S. contends, its effect was stayed pending majority voter approval at a referendum election. *See* Or. Const. art. IV, § 1(4)(d). That majority voter approval was not achieved. Nor is it necessarily the case that it would have been achieved even if we assume, as we must, that M.S.'s claims are meritorious. M.S. does not (and could not) allege that, in a referendum election untainted by improper animus, a majority of voters would have voted in favor of Measure 88. *Cf. Am. Civil Liberties Union of Nevada v. Lomax*, 471 F.3d 1010, 1015–16 (9th Cir. 2006) (concluding there was redressability where plaintiffs had challenged initiative signature rules because, assuming the plaintiffs were to succeed on the merits of their challenge, "[t]he initiative *would have obtained the requisite percentage of statewide signatures*." (emphasis added)).

In short, M.S.'s requested declaration would not be tantamount to majority voter approval, which is required under the Oregon Constitution for SB 833 to take effect and thus authorize the issuance of driver cards. Because the declaration would not require the Governor to issue driver cards, and M.S. has not alleged that she is otherwise likely to obtain access to driving privileges as a result of the

declaration,[10] there is no redressability as to this form of relief.[11]

## 2.

Next, M.S. seeks a declaration that the Governor is "authorized and required to issue driver cards pursuant to SB

---

[10] M.S. has not adduced any facts to suggest that the State would hold a special referendum election if the district court were to issue her requested declaration. Further, M.S. has not requested that the district court itself order a special referendum election, and therefore we need not pass on whether M.S. could establish redressability through such a remedy.

[11] M.S. raises two additional arguments based on Oregon law, both of which we reject. First, M.S. relies on several Oregon cases for the proposition that, "whether or not the effective date of a law has been suspended, it still is a law and can become operative if certain conditions are met." That general proposition is correct, but none of M.S.'s cited cases involves a properly initiated referendum vote that disapproved of a measure and was subsequently ruled unconstitutional. In such circumstances, the "bill," "measure," or ineffective "law" referred to the people cannot become operative because the "condition" of majority voter approval has not been met.

Second, M.S. alludes to the proposition that "a court will not inquire into the substantive validity of a measure—*i.e.*, into the constitutionality, legality or effect of the measure's language—unless and until the measure is passed." *Boytano v. Fritz*, 901 P.2d 835, 837 (Or. 1995) (en banc) (quoting *Foster v. Clark*, 790 P.2d 1, 4 (Or. 1990)). According to M.S., a "necessary corollary" of this principle is that "a measure which on subsequent review is found to be substantively invalid does not effectively repeal a statute passed by the Legislature." The principle stated in *Boytano* is inapposite here, however, because M.S. does not challenge the "substantive validity" of Measure 88. Nor would such a challenge benefit M.S., given that Measure 88 would have provided her access to driver cards. Rather, M.S. challenges the validity of the *voters' rejection of Measure 88. See supra* note 5.

833." Unlike M.S.'s first requested judicial declaration, this declaration, if issued by the district court, would redress M.S.'s claimed injury by "requir[ing]" the Governor "to issue driver cards." *See, e.g.*, *L.A. Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 701 (9th Cir. 1992) ("Were this court to issue the requested declaration, we must assume that it is substantially likely that the California legislature . . . would abide by our authoritative determination."). We hold, however, that on the facts alleged here, the district court lacks the power to issue such an intrusive declaration, which would amount to a requirement that the Governor effectuate a bill that never became law. First, the requested declaration is incompatible with democratic principles embedded in the structure of the Constitution, as well as the principle that equitable remedies must be tailored to fit the nature of the constitutional violations alleged. Second, under the unusual circumstances of this case, the declaration also violates principles of federalism. Accordingly, M.S. cannot establish redressability through her second request for relief. *See Republic of Marshall Islands*, 865 F.3d at 1199.

**a.**

We begin by recognizing the circumstances in which an improperly motivated referendum or initiative outcome may give rise to a justiciable constitutional claim—i.e., as relevant here, a claim capable of alleging a redressable injury.[12] Where a plaintiff challenges the "substantive

---

[12] M.S. alleges that the Governor's ongoing "refusal to issue driver cards" is unconstitutional on the ground that she is effectuating the voters' improperly motivated "no" votes on Measure 88 at the referendum, not that such votes were themselves unconstitutional acts. As explained above, we assume at this stage that the above theory of official liability is both cognizable and meritorious. *See Bonnichsen*, 367 F.3d at 873. Nonetheless, because the gravamen of M.S.'s

result" of an initiative or referendum election on the basis of improper voter motivation, a federal court has the power to declare such a result unconstitutional. *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 199 (2003) (quoting *Eastlake v. Forest City Enters., Inc.*, 426 U.S. 668, 676 (1976)). Thus, for example, a federal court may invalidate the repeal of an existing law if the voters enacted or approved the repeal for discriminatory reasons. *See Crawford v. Bd. of Educ.*, 458 U.S. 527, 539 n.21 (1982) (citing *Reitman v. Mulkey*, 387 U.S. 369, 380 (1967)). The exercise of judicial power in this manner—that is, as a check on the people's power to enact or repeal laws (repeals themselves being a type of enacted law)—is appropriate because "[t]he sovereignty of the people is itself subject to those constitutional limitations which have been duly adopted and remain unrepealed." *Hunter v. Erickson*, 393 U.S. 385, 392 (1969).

The *absence* of a law, however, has never been held to constitute a "substantive result" subject to judicial review, and for good reason: it is axiomatic that "the Constitution contemplates that democracy is the appropriate process for change, so long as that process does not abridge fundamental rights." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2605 (2015). This is no less true in the context of Article III standing, where federal courts must respect their "proper—and properly limited—role . . . in a democratic society." *Gill*, 138 S. Ct. at 1929 (quoting *Allen*, 468 U.S. at 750). The democratic principle recognized in *Obergefell* is so

---

complaint is that the result of the referendum was improperly motivated, we consider the district court's power to order relief in relation to that allegation. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971) (explaining that "the *nature of the violation* determines the scope of the remedy" (emphasis added)).

fundamental that it comes as little surprise that courts have seldom had occasion to apply it directly as a constraint on federal judicial power. We are not, however, the first court to consider whether to do so. Reviewing the propriety of a remedy similar to that requested here, the Sixth Circuit explained:

> Federal Courts do have jurisdiction and power to pass upon the constitutionality of Acts of Congress, but we are not aware of any decision extending this power in Federal Courts to order Congress to enact legislation. To do so would constitute encroachment upon the functions of a legislative body and would violate the time-honored principle of separation of powers of the three great departments of our Government. *This principle is equally applicable to the power of a Federal Judge to order a state legislative body to enact legislation.* The enactment of legislation is not a ministerial function subject to control by mandamus, prohibition or the injunctive powers of a court.

*Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 797 (6th Cir. 1996) (emphasis added) (quoting *Joseph Skillken & Co. v. City of Toledo*, 528 F.2d 867, 878 (6th Cir. 1975), *vacated and remanded sub nom. Joseph Skilken & Co. v. City of Toledo*, 429 U.S. 1068 (1977), *decision adhered to on remand*, 558 F.2d 350 (6th Cir. 1977)). Although the scope of this pronouncement may be overbroad—as we explain more fully below, federal courts have jurisdiction to order a remedy requiring the enactment of legislation in certain narrow circumstances, such as where

fundamental rights are at stake—we agree with it in principle.

In light of the bedrock democratic principle recognized in these cases, we decline to extend the Supreme Court's "substantive result" jurisprudence beyond its current scope. Rather, we hold that, except in certain circumstances not applicable here, *see infra* pp. 22–24 & note 14, structural constitutional limits prevent federal courts from ordering government officials to enact or implement a bill that has not completed a lawfully prescribed legislative process—which, in Oregon, requires majority voter approval once a bill is properly referred to a referendum.[13]  Or. Const. art. IV, § 1(3); *see supra* pp. 14–16.

The authorities relied upon by M.S. are consistent with this holding, and indeed assist us in explaining its limits.  In *Eu*, we held that a plaintiff could seek declaratory relief that would have required the California Legislature to amend a state statute to authorize more judgeships and the governor to fill the new positions.  979 F.2d at 699, 701.  To be sure, California's legislative process for amending the judgeships statute was not complete—indeed, it may never have

---

[13] Where the *federal* legislative process is at issue, the democratic principle we rely on today does not provide the only constraint on the federal courts' subject matter jurisdiction.  Separation of powers concerns are also implicated in that scenario, *Smith & Lee*, 102 F.3d at 797, as is the Speech and Debate Clause of the Constitution, *Newdow v. U.S. Cong.*, 328 F.3d 466, 484 (9th Cir. 2003) (concluding that, in light of the Speech and Debate Clause, "the federal courts lack jurisdiction to issue orders directing Congress to enact or amend legislation"), *rev'd on other grounds sub nom. Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004).

begun—at the time we decided the case.  Nonetheless, *Eu* is distinguishable from the present case in two ways.

First, unlike M.S., the plaintiff there alleged that the limited number of judgeships violated the "*fundamental right* of access to the courts in civil litigation."  *Id.* at 705 (emphasis added).  Our holding today does not prevent federal courts from ordering government officials to vindicate fundamental rights, even where the means for doing so have not been democratically approved.  As the Supreme Court has recognized, "fundamental rights may not be submitted to a vote; they depend on the outcome of no elections."  *Obergefell*, 135 S. Ct. at 2606 (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943)).  M.S., however, does not allege that she has a fundamental right to access driving privileges.  Thus, "democracy is the appropriate process" for the change she seeks.[14]  *Id.* at 2605.

Second, also unlike M.S., the plaintiff in *Eu* challenged the constitutionality of the existing statute prescribing the number of judgeships rather than solely the absence of a statute.  979 F.2d at 699.  Our holding today also allows for

---

[14] Apart from the realm of fundamental rights, we do not foreclose the possibility that there may be other narrow circumstances in which federal courts can order a remedy requiring government officials to implement or enact legislation.  In particular, such a remedy may be appropriate to vindicate a right that has vested such that it is beyond the control of the democratic process.  *Cf. McCullough v. Virginia*, 172 U.S. 102, 123 (1898) ("It is not within the power of a legislature to take away rights which have been once vested by a judgment."); *cf. also, e.g.*, *Jorgensen v. Blagojevich*, 811 N.E.2d 652, 668–70 (Ill. 2004) (concluding that the court had the power to order state officials to pay cost of living adjustments guaranteed under the state constitution to state judges even after the state legislature specifically voted not to enact an appropriation for them).  Here, however, M.S. does not allege that she possesses any such right to driving privileges.

this type of challenge, as federal courts undoubtedly have the power to strike down existing laws as unconstitutional, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), even where doing so would require the enactment of a new law, *see, e.g.*, *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 87–88 (1982). Here, however, M.S. does not challenge the constitutionality of the REAL ID Act or SB 1080, the Oregon law implementing the REAL ID Act, and thus we are presented only with a challenge to the State's failure to effectuate SB 833 after Measure 88 failed to obtain voter approval.

M.S. also points to *SDDS, Inc. v. South Dakota*, 47 F.3d 263 (8th Cir. 1995), where the Eighth Circuit held that the voters' rejection of a statute at a referendum election, and the initial referral of the statute to the voters, violated the Dormant Commerce Clause. *Id.* at 268, 272. Although the court did not expressly consider the question of standing, its exercise of jurisdiction was nonetheless consistent with the result we reach here. The court had the power to order relief that would effectuate the statute rejected by the voters because, in the absence of a valid initial referral to the voters, the legislative process was complete. Here, in contrast, M.S. does not challenge the initial referral of SB 833 to the voters. After that referral, the legislative process for SB 833 was, and remains today, incomplete pending majority voter approval.[15]

---

[15] M.S. also relies on the *City of Cuyahoga Falls* Court's passing comment that the "respondents do not challenge the referendum itself" to argue that the absence of a law following a referendum or initiative election is subject to judicial review. We reject this argument because that comment simply distinguished a past case in which the plaintiff had challenged a law resulting from an initiative or referendum. 538 U.S. at 199 (citing *City of Eastlake*, 426 U.S. at 676).

In sum, *Eu* and *SDDS* are consistent with the basic democratic principle that courts are not an appropriate vehicle for effectuating change from a lawful status quo—here, Oregon's refusal to issue driving privileges without proof of legal presence in the United States—and it is that basic principle which guides our holding today.

Finally, to the extent M.S. seeks to invalidate the initial referral of SB 833 to the voters—which, as we have just explained, would effectively render the legislative process complete—such a remedy would not comport with well-settled principles of equity. The scope of an equitable remedy must be "tailor[ed] . . . to fit 'the nature and extent of the constitutional violation.'" *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 420 (1977) (quoting *Milliken v. Bradley*, 418 U.S. 717, 744 (1974)); *see also, e.g.*, *Gill*, 138 S. Ct. at 1931 (concluding that plaintiffs did not establish redressability because, inter alia, their requested remedy was not "limited to the inadequacy that produced the injury in fact" (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Again, M.S. does not allege that the initial referral of SB 833 to the voters was improper in any way. Instead, she challenges only the voters' rejection of Measure 88 and the Governor's subsequent decision to abide by the result of the referendum election. Thus, there is no basis for the district court to invalidate the referral of SB 833 to the voters and the corresponding suspension of the bill's effect. The legislative process for SB 833 to become law remains incomplete, and the district court cannot issue declaratory relief authorizing and requiring the Governor to implement it.

## b.

Under the circumstances of this case, principles of federalism also prevent the district court from ordering relief

that would require the Governor to implement SB 833. Principles of federalism "have applicability where injunctive relief is sought . . . against those in charge of an executive branch of an agency of state or local governments," *Rizzo v. Goode*, 423 U.S. 362, 380 (1976), as well as where declaratory relief is sought against such officials, *see, e.g.*, *Jacobson v. Tahoe Reg'l Planning Agency*, 566 F.2d 1353, 1366 (9th Cir. 1977), *aff'd in part, rev'd in part on other grounds sub nom. Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391 (1979). In particular, we have explained that "[p]rinciples of federalism counsel against" awarding "affirmative injunctive and declaratory relief" that would require state officials to repeal an existing law and enact a new law proposed by plaintiffs.[16] *Id.* (citing *Rizzo*, 423 U.S. at 380).

The interaction between the federalism limits on a district court's remedial power, invoked in *Rizzo*, and a district court's power in general to order prospective relief against state executive officials under the *Ex parte Young* fiction, remains an open and contentious area of the law. *See* R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, *Hart and Wechsler's The Federal Courts and the Federal System* 1170 (7th ed. 2015). For present purposes, however, we need not decide whether there are any circumstances in which principles of federalism provide an independent limit on a district court's power to order prospective relief against state officials. We are confident that where, as here, a plaintiff

---

[16] That principles of federalism "counsel against" such relief, *Jacobson*, 566 F.2d at 1366, does not mean that such relief is always improper, *see, e.g.*, *Eu*, 979 F.2d at 703 (noting that "principles of federalism" were "emphatically" implicated by declaratory relief that would require the California Legislature to amend a statute, but nonetheless allowing the plaintiff to seek such relief).

sues state officials seeking intrusive affirmative relief that is incompatible with democratic principles and where there is no basis for the district court to invoke its equitable power, *see supra* pp. 18–24, such relief would also violate principles of federalism.  *See, e.g.*, *Rizzo*, 423 U.S. at 378–80.  Thus, on the facts presented here, principles of federalism provide an additional barrier to the district court's power to issue M.S.'s requested declaration.[17]

### 3.

Finally, M.S.'s third request for relief is for an injunction, "if necessary," to enforce the declarations she seeks in her first and second requests.  As M.S.'s first two requests do not establish redressability for the reasons stated above, M.S.'s request for injunctive relief to enforce those requests—which, we note, would be even more intrusive than a declaration, *see Eu*, 979 F.2d at 703—likewise falls short.

---

[17] The district court relied in part on the Supreme Court's "anticommandeering" decisions in *Printz v. United States*, 521 U.S. 898 (1997), and *New York v. United States*, 505 U.S. 144 (1992), which have recently been joined by *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018).  *Brown*, 222 F. Supp. 3d at 913.  We decline to follow this reasoning, however, because "this case is not, like *Printz* and *New York*, an attempt by the federal government to require the State to carry out a federal obligation.  Rather, it is an action by private parties . . . to enforce their own rights under . . . the Constitution."  *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1069 (9th Cir. 2010); *see also New York*, 505 U.S. at 179 (distinguishing cases that discuss "the power of federal *courts* to order state officials to comply with federal law," because "the text of the Constitution plainly confers this authority on the federal courts").

## III.

M.S. calls our attention to the daunting prospect of returning to the political process to seek access to driving privileges that she and others like her need in order to drive legally to their jobs, doctors, schools, and churches. That process, she asserts, "is an illusion for members of disfavored minority groups as long as their rights are subject to popular veto referend[a] infected by racial or other class-based animus." We do not deny the force of this argument, which has shaped our Fourteenth Amendment jurisprudence for the last eighty years. *See United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 n.4 (1938). Nonetheless, the risk of improper animus infecting the political process does not confer upon the federal courts the power to assume the functions of a legislature or the people in their legislative capacity.

We recognize that our opinion reflects an asymmetry in federal judicial power: federal courts have the power to remedy injuries flowing from a discriminatory law, but not the power to remedy injuries that exist after the discriminatory rejection of a law—at least where fundamental rights or other similarly vested rights are not at stake. That asymmetry, however, is the product of our constitutional structure and the democratic system of government it establishes. Injuries that exist following the discriminatory rejection of a law are, by definition, injuries that already existed in our society. Those injuries may be just as severe as any that flow from a duly enacted law. But unless the state action that causes an existing injury is itself unlawful, any redress must lie exclusively in the democratic process.

For all of the above reasons, M.S. has not established the redressability element of Article III standing. Accordingly,

the district court did not err in dismissing the case for lack of subject matter jurisdiction.

**AFFIRMED.**